**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 04-03127-01/02-CR-S-ODS |
| | ) | |
| DEBRA JAMES and | ) | |
| RICK D. CANTRELL, | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

Defendant Debra James has filed a Motion to Suppress Evidence in which she asserts that all evidence discovered and statements made during the search of her residence on October 8, 2004, should be suppressed. The government has responded to that motion.

The matter was set for an evidentiary hearing, which was held before the undersigned on December 21, 2005. The defendant was present with counsel, Nancy Price, Assistant Federal Public Defender. Co-defendant Rick Cantrell was present with counsel, Shane Cantin. The United States was represented by Richard Monroe, Assistant United States Attorney.

Sheriff Travis Taylor, Chief Deputy Sheriff for Douglas County, was the first witness to testify for the government. It was his testimony that he had received multiple calls for service for defendant Debra James' property. Regarding the calls for service, he admitted that some of these involved allegations of abuse by Mr. William Wolf, defendant's ex-husband. He testified that defendant's father, Mr. Charles James, jointly owned the property with her. Mr. James had told the officer that they could enter the property any time they wanted, because he did not want any problems with possession of stolen property, methamphetamine, and that kind of illegal activity. The

father put no limitations on law enforcement's authority to enter the property. All the officers involved knew about this consent to enter the land.

On cross-examination, it was Officer Taylor's testimony that he did not remember when he spoke to Mr. James about his concerns regarding his property, but he stated that Mr. James had told several different officers at different times that they could enter the property. On one occasion when they spoke, Officer Taylor had recovered a stolen ATV, and Mr. James told him "that anytime we needed to go down in there, that there would be no problem. You just do what you needed to do, and he didn't want any of that kind of activity going on in his property." [Tr. 13]. The officer acknowledged that there was not a gate on the property at that time. When questioned about a report prepared by Officer Johnson, on October 6, 2004, he verified that it indicated that Sharon Chastain had reported that her vehicle had been stolen by co-defendant Rick Cantrell, and that officers from their department had attempted to locate Cantrell at defendant's residence on multiple occasions. He also identified a complaint prepared by Officer Johnson in support of a felony stolen vehicle charge filed against Cantrell, and a request for a warrant.

Sheriff Gary Koop next testified for the government. He is familiar with defendant's residence. Sheriff Koop testified that he had had two conversations with Mr. James regarding his property before October 8, 2004. The conversations, to the best of his recollection, occurred within a couple of years of October 8, 2004. Mr. James told him that he did not condone what was going on, and he wanted the officers to do whatever they could to correct the problem.

On cross-examination, the Sheriff stated that at least one of the conversations occurred during the time that defendant was married to William Wolf. Regarding the report about the stolen Oldsmobile, he was not familiar with numerous attempts by the officers to go to defendant's residence to search for the Oldsmobile.

The government called Ron Wallace, who is now an associate pastor, to the witness stand. At the time of the incident in question, he was a Douglas County Deputy Sheriff, working as a narcotics investigator. On October 8, 2004, he was aware of an outstanding state arrest warrant for co-defendant Cantrell. He was also aware of a federal warrant for defendant on that date. Additionally, he knew about the report regarding the stolen car. He thought that both defendants' names were associated with the stolen car. He is familiar with defendant's residence, and had been there many times. He stated that there is a tract of land that must be crossed to get to the residence, and that, to his knowledge, defendant did not have any ownership interest in that property. Mr. Wallace testified that he could remember at least two occasions when Mr. James asked the officers for help. Once of these conversations occurred on September 28, 2002, when the officers were at the residence regarding a domestic assault case. The other conversation was later. He gave the officers permission to go on his property and to the residence, if they believed something was going on, without being specific about a time limit. Rather, Mr. James just indicated that he was tired of what was going on, and that they could enter whenever they wanted. Mr. Wallace testified that they received information from a confidential informant that defendant was at her residence on the day in question. Subsequently, they went to the property. There are two gates before the residence is reached. The first gate was padlocked, and the officers cut the lock. From the county road, it was about a mile to the residence. As they came down the hill, before they reached the residence, they saw defendant in a vehicle, which matched the vehicle reported stolen. The car was right off the lane the officers were on. He asked her to exit the vehicle, which she did. He advised her she was under arrest for a federal warrant. Defendant told him, upon questioning, that co-defendant Cantrell was at her residence. In addition to having an arrest warrant for Cantrell, he also had information that he could possibly be violent. Therefore, Mr. Wallace asked defendant if there were weapons

in the residence, and she said there were. Mr. Wallace requested permission to get co-defendant from the residence, which she gave. After defendant was arrested, a subsequent search revealed suspected drug paraphernalia and items for methamphetamine production. Mr. Wallace testified that they then proceeded to the residence, where Mr .Cantrell answered the door and was placed under arrest. The officer then asked defendant for further consent to search, which she gave. At some point, Mr. Cantrell stated that everything in the residence was his. During the search, the officers found evidence of methamphetamine production and use, small amounts of marijuana, and loaded weapons. Defendant was present during the search. She stated that the firearms were hers, and asked if they could be taken to her father, which request was denied.

On cross-examination, the officer testified that he had been at defendant's residence at least ten times. He had served two prior search warrants and had conducted surveillance on the residence before these search warrants. He testified that the residence cannot be seen from the county road or at the first gate. It was also his testimony that he could not see the stolen vehicle from those locations. He had never encountered co-defendant Cantrell before. It was his testimony that he had information from the confidential informant that Cantrell was at the residence that day, but he had no other information to confirm this. He stated that this was first time that he had ever seen the gate locked. None of the officers entered the property before the lock was cut. The officer testified that he knew he had previously entered the property in 2004, but he did not recall when. Mr. Wallace admitted that some of the occasions when he was on the property in 2002 involved domestic abuse involving both defendant and her husband. He went to the property on October 8, based on information from the confidential informant, which was received via telephone on that day. The informant advised that co-defendant was at the residence, but Mr. Wallace did not remember a time frame. He specifically remembered that the informant said they had been together, but he did not

remember if this was at the residence. The information that he had was that they were at the residence that day. Regarding other information from the confidential informant, some of it had involved co-defendant Cantrell, which was corroborated by other individuals. The confidential informant who provided information had been used in the past on multiple occasions and the information had been reliable, leading to arrests and controlled buys. Regarding his conversations with Mr. James, it was Mr. Wallace's testimony that the permission that he was given to enter the property was not limited to domestic abuse. Mr. James specifically stated that if the officers had any information of any illegal activity, they had permission to go on the property and take care of it.

Defendant called Charles James to testify. Mr. James stated that he owned the property where defendant lived. It was his testimony that defendant and her son had most of the financial investment in the residence. There is a locked gate at the public road, before the drive going to the residence. The gate was there several years, and in the summer of 2002, he had it taken off for easier access. In the fall of 2002, law enforcement officers were called to the property because of the suspected drug activity of William Wolf. He told them he would appreciate it if they would look for drugs involving Mr. Wolf. He told the officers that he thought Mr. Wolf might have drugs hidden on the property. The officers went onto the property a few days later. He told them there were no gates there, and everything was open. His instructions were to go look for stuff that Mr. Wolf might have hidden. In August 2003, his son lived in a house inside the gate area, which mysteriously burned. In 2004, he had a new gate and posts put in because everything was quiet, and Mr. Wolf was gone. Mr. James also put a padlock on the gate. When he gave the officers consent to enter his property in 2002, he considered it for that time frame because Mr. Wolf was there. When he put the lock on his gate, he did not give law enforcement a key. It was a year and a half later when he put the gate back, from the time he gave his consent, and two years later when the

officers cut it.

On cross examination, Mr. James testified that the gate was on property he still owned. To get to the land that he deeded to another daughter, you must cross his three acres. To reach defendant's residence, the other daughter's 37 acres must also be crossed over. He testified that he had called law enforcement about both Mr. Wolf and fires on the property.

Defendant contends that she was illegally arrested. She challenges the execution of the arrest warrant on the basis that the officers did not have a reasonable belief that she was currently present at her residence when the warrant was executed. It is her position that the officers had a reasonable belief that she resided at the location, but did not have a reasonable belief that she was home when they made entry onto the property by cutting the lock on her gate. She asserts that the information from a reliable source was not enough to establish her current presence at the residence because it is in a highly secluded area and there would be an extremely limited opportunity for anyone to know that she was at the residence at the time in question.

It is the government's position that, under the open fields doctrine, the initial entry at the gate and the initial encounter with defendant are not subject to suppression. It is contended that the gate area and the large rural tract were not within the curtilage of her residence. Further, the government asserts that, when the officers encountered defendant, she was not at home, but rather, was in a stolen vehicle outside the curtilage. Therefore, it is argued that, having seen the stolen vehicle, the officers were duty bound to recover it, search it, and apprehend the person whom they found in possession of it. Regarding defendant's argument that the officers were legally required to know that she was present in the residence to enter it to arrest her, the government contends that this is irrelevant because she was found outside of her residence, outside the curtilage of it, and in possession of a stolen vehicle. Further, the government asserts that the officers had reason to believe

that the title owner of the property, Charles James, had given them consent to search the property. Additionally, it is argued that defendant, after her arrest, gave consent to search the house, both for co-defendant Cantrell and otherwise. Therefore, it is contended that even if defendant had been in a constitutionally protected area, the prior consent of Mr. James obviates any Fourth Amendment claim. It is further asserted that, even absent the open fields doctrine and consent, the arrest of defendant and the co-defendant were lawful executions of arrest warrants. The warrants, together with information from a reliable confidential source that defendant and the stolen vehicle would be found at her residence, are alleged to be adequate for the arrest. Finally, the government contends that the arrest of defendant was further justified on the basis that she was in the process of committing the felony of possession of a stolen vehicle in the officers' presence.

The initial question before the Court must be defendant's expectation of privacy in the area where she was found and arrested. The government argues that under the "open fields" doctrine, the land at the gate and the large rural tract on which the stolen vehicle was found were not within the curtilage of defendant's residence, and therefore, what the officers observed there is not subject to suppression.

The Fourth Amendment protects a home and its curtilage from warrantless searches. United States v. Dunn, 480 U.S. 294 (1986). "Curtilage" has been defined as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" Oliver v. United States, 466 U.S. 170, 180 (1984) (citation omitted). In Dunn, the Supreme Court addressed the issue of defining the extent of a home's curtilage, finding four factors to be relevant: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." Dunn, 480 U.S.

at 301 (citations omitted). The Court held that "these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration–whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." Id. In contrast, Fourth Amendment protection does not extend to "open fields," as no expectation of privacy legitimately attaches to open fields. Oliver, 466 U.S. at 180. The open fields doctrine allows a search of what is in plain view in the open field. United States v. Pennington, 287 F.3d 739, 745 (8th Cir. 2002).

On the basis of applicable case law and the evidence in this case, the Court finds that the area in which defendant was found was clearly beyond the curtilage of her residence and that the open fields doctrine comes into play. The evidence adduced at the hearing established that defendant's father owned approximately three acres of land on which the padlocked gate was located. Beyond that, he believed there were about 37 acres that he had deeded to another daughter, Collena White. According to Mr. James, he also owned the legal title to the land on which defendant's residence was located. The locked gate was located at the public road and before the drive or lane that led to defendant's house. To get to the land he deeded to Collena, the three acres where the gate was had to be crossed. Then, to reach defendant's house, Mr. James testified that the 37 acres had to be crossed. Mr. James did not know for a fact exactly where the vehicle was located in which defendant was found, but according to his markings on the aerial map of the property, the vehicle was located somewhere on land between the gate and the house, closer to the house. According to the officers, it was right off a lane leading to defendant's residence. Clearly, however, the entry point for the officers was far removed from defendant's residence, and under any definition of curtilage, was obviously beyond that area. Similarly, the area where the vehicle was located was beyond the curtilage. It is obvious that the open field in this case was owned by other than

defendant.

Applying the Dunn factors, it is obvious that the area where defendant was found was not within the curtilage of her home. Although the testimony was not precise on this issue, it is apparent that her house was a considerable distance from where the vehicle was found. Accordingly to Mr. Wallace, her residence was about a mile from the gate. The vehicle itself was just off the lane or drive, and was within plain view of the officers as they approached on that lane. That area of land, where the gate was located and where the vehicle was found, did not even belong to defendant, and she had not put it to any use that would implicate her Fourth Amendment rights. There was no evidence that the officers were in any proximity to her house until she gave her consent for them to go there. Based on the credible evidence adduced at the hearing, the gate was on land solely owned by defendant's father. Therefore, she had no reasonable expectation of privacy in the area of the gate, nor the land on which the vehicle was found, and thus, has no standing to challenge the officers' entry through the gate and onto the land. The law provides that an individual challenging a search and seizure can establish a sufficient interest to constitute standing "if he has an adequate possessory or proprietary interest in the place or object searched" and if this assertion of a property interest is supported by an expectation of privacy. See United States v. Kelly, 529 F.2d 1365, 1369 (8th Cir. 1976). From the facts that were adduced at the hearing in this case, the Court finds that defendant has failed to establish that she had an adequate privacy interest in the area that was searched sufficient to establish standing. Therefore, the Court finds that it must be recommended that defendant's motion to suppress be denied.

Even if it were to be found that the open fields doctrine did not apply, the facts establish that the officers were investigating a call regarding a stolen vehicle, they had arrest warrants for both defendants, they had reliable information that defendants were located at the residence, and they

were operating under a good faith belief that they had consent to enter the property. See Frey v. Leapley, 931 F.2d 1253, 1255 (8th Cir. 1991). Accordingly, the Court finds that there was no Fourth Amendment violation, and that the motion to suppress should be denied on this basis as well.

In this case, the officers had a warrant for defendant's arrest. They also had information from a confidential source that she was at the residence and in possession of a stolen vehicle. This information was received on the day of the arrest, and it cannot seriously be argued that it was not timely information. Further, the Court is satisfied, based on Mr. Wallace's testimony at the hearing, that the confidential source was reliable, having provided reliable information in the past. Additionally, the officers involved in this case all credibly testified that they were operating under the assumption that they had permission from the title owner of the land, Mr. Charles James, to enter the property to thwart illegal activity. The Court recognizes that there is some support for the contention that Mr. James did not intend this consent to enter to continue indefinitely. He testified that he did not intend it to continue, and he described how he padlocked one of the gates. There was no testimony, however, that he ever expressed, at the time he asked law enforcement for help, that his consent was limited to a given time period. Further, there is no evidence that he ever rescinded his consent. Even if Mr. James believed in his own mind that the consent was limited, there is nothing to suggest that any of the officers knew this to be the case. Additionally, the time frame at issue, a period of two years, is not such a lengthy period of time that it would have to be concluded that their belief that they had consent was unfounded or not based on good faith. Therefore, the Court finds that the officers had a reasonable belief that they had permission to enter the property. The Court believes that the government is correct in its assertion that the information from the confidential informant, along with the arrest warrant, were sufficient for them to enter the property. Once there, outside the curtilage of the residence itself, they observed defendant in a reported stolen

vehicle. It is obvious that her arrest was legal because of her unlawful activity, as well as on the basis of the arrest warrant. Accordingly, the Court would recommend that defendant's motion to suppress be denied.

Based on the foregoing, it must be recommended that defendant James' motion to suppress be denied.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 22 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendant's Motion to Suppress be denied.

/s/ James C. England
JAMES C. ENGLAND, CHIEF
UNITED STATES MAGISTRATE JUDGE

Date: 1/9/06